# MERRIMACK,

## DECEMBER TERM, A. D. 1843.

The Second Congregational Society in Hopkinton

*vs.*

The First Congregational Society in Hopkinton
& a.

A party to a suit in equity cannot be examined as a witness, except upon leave granted.

Leave is always granted to examine merely formal parties, upon motion and a suggestion that the witness is not interested, and saving all just exceptions.

But an executor, holding property in trust, cannot be examined on behalf of his *cestui que trust*.

A bequest to the "westerly part of Hopkinton" gives no legal title to any party or corporation to receive it.

But a court of equity would in such case order the executor to pay the legacy to a plaintiff who should establish an equitable title thereto.

Extrinsic evidence will be admitted, to enable such a claimant to establish his title.

Whether such a bequest, on condition that "the inhabitants will settle a Congregational minister within three years after my death," would avail to the benefit of a religious society, in part composed of inhabitants of the west part of the town, but which was formed since the execution of the will, and which has its place of worship in a village which has sprung up since that time, *quære?*

*It seems,* that in order to entitle the inhabitants of the westerly part to the benefit of such a legacy, it would not have been necessary to show a corporate existence.

The settlement of a minister, required by such a bequest, is not complied with by an engagement for occasional preaching by a non-resident, no matter with what ceremonies or rites he may have been inducted into office.

Such a bequest closed with a provision, that if the settlement was not made as required, the fund should go to another religious society.—*Held,* that in case of a non-fulfilment of the condition by the inhabitants of the westerly part, there would be no failure of the charity which would authorize this court, sitting in equity, to interfere, and settle the charity anew by the doctrine of *cy pres.*

But, *quære,* whether the objection to the settlement of the plaintiffs' minister, as above stated, would not in any case have excluded them from the benefit of the charity ?

In Equity.   The bill in this case, in which one Thomas Bailey was the other defendant, stated that Amos Bailey, yeoman, late of Hopkinton, died December 18th, 1834, leaving a will dated December 5th, 1831, which contained, among other things, the following clauses :

" Eighthly.   After all my just debts are paid, I give, bequeath and devise one half of the remainder of all my property to the First Congregational Society in Hopkinton, to which I belong, to be kept in bank forever, and the interest to be laid out for the support of the gospel of Jesus Christ.

" Ninthly.   I give, bequeath and devise the other half of all my property to the westerly part of Hopkinton, if the inhabitants will settle a Congregational minister within three years after my decease, which shall be kept in bank forever, and the interest of it shall be laid out for the support of the gospel and nothing else.   If they do not settle a Congregational minister in the westerly part of Hopkinton within three years from my decease, the interest of the whole to go to the First Congregational Society, to which I belong, to be put in bank by my executor hereafter named."

That the said Thomas Bailey was made executor of said will, and has proved the same, and reduced said Amos' estate to cash, and that upon settlement of his accounts in the probate court there was a balance of more than $3000 in his hands.

The bill then states that on the 26th of December, 1836, five persons, (naming them,) and their associates, all male inhabitants of the westerly part of Hopkinton, and twenty years old and upwards, " and members of the sect of Christians called Congregationalists," formed a religious society, and organized under the statute provisions, as a corporation, under the name of " The Second Congregational Society in Hopkinton" : That November 4th, 1837, said Society

fixed the place for their regular meetings, worship, and ordinances, at the new meeting-house in Contoocook Village, in the westerly part of Hopkinton : That December 14th, 1837, a Christian church, of the Congregational order, was duly constituted at Contoocookville, in connection with said Second Congregational Society, according to the rights and usages of the said Congregational order : That on the same day the Rev. David Kimball was duly installed, and settled as pastor and minister over said church and society, he being a Congregational minister ; and having, to the time of filing the bill, duly and acceptably performed all his duties as such, by preaching at said new meeting-house, &c., &c. : That there were fifty adult male members of said society at the time of settlement, but now sixty-two.

The bill alleges that said new meeting-house is in the westerly part of Hopkinton, and convenient in all respects for the general accommodation of the inhabitants of the westerly part of Hopkinton, and is open for their general use and accommodation : That March 24th, 1838, the plaintiffs made a demand on the executor for the income of one half of the residue, to be by them applied to support the gospel preached and administered to the inhabitants of said westerly part of said town by the said David Kimball, settled as aforesaid ; but the executor refused to pay over the same, or in any way to appropriate the same, or any part thereof, for the support of the gospel in said westerly part of Hopkinton, according to said will.

That the First Congregational Society have denied the plaintiffs' claim to the same, and on February 17th, 1838, claimed the whole of said income for their own use, and forbad the executor to appropriate any part thereof for the support of the gospel in the westerly part of said Hopkinton.

The bill concludes with the usual prayers.

The answer of the defendants admitted the execution and proof of the will, and sale of real estate, and that a balance

will, after a final settlement, remain in the executor's hands ; but denies that a final settlement of his accounts has been had. What sum will finally remain in his hands they cannot tell.

It also alleges that Hopkinton contains 36 square miles, and gives the boundaries ; that the population is about 2500 ; that about 1200 reside west of a line which would divide the town into equal portions west and east ; that Contoocook Village is about two and a half miles from the westerly town line, and about one and a fourth miles from the northerly line, and contains, within a circuit of two miles diameter, not more than 300 inhabitants.

The defendants believe it to be true, that the five persons named in the bill, and their associates to the number of forty, claiming to be Congregationalists, residing in or near said village, many of them being professed Universalists, at some time in 1837 organized under the statute, assumed the name, and established the place of their meetings, &c., as stated in the bill ; and also that at some time in the same year a Christian church of the Congregational order was pretended to be established at Contoocook Village, in connection with said society ; but the defendants deny that said persons constitute all, or a majority of, the inhabitants of the westerly part of Hopkinton, or of " the westerly part of Hopkinton" in the contemplation of said Amos Bailey, when he executed his will, or in the language and meaning of said will ; and they also deny that a Christian church of the Congregational order was duly constituted and established at said village, or in the westerly part of Hopkinton, in connection with said society, according to the rites and usages of the Congregational order and denomination of Christians, on December 14th, 1837, or at any other time. They also allege that the said five persons, and their associates, and all the members of said pretended church, live in and near said village.

The defendants believe it to be true that in December,

1837, said society contracted with David Kimball to preach for them, but they deny that the inhabitants of the westerly part of Hopkinton have settled a Congregationalist minister; and they allege that said Kimball is, and then was, a resident in the town of Concord.

The defendants know nothing, save by the complainants' bill, as to the manner in which said Kimball has discharged his duties.

From the testimony taken in the case, the following facts appeared: From the year 1793 to 1831 there was a meeting-house in the westerly part of Hopkinton, distant about 630 rods from the west line of the town, 1485 rods from the east line, 1080 rods from the south line, and 1140 rods from the north line. This meeting-house was 219 rods from the testator's house. Its location was originally a matter of controversy, and a great effort was made to locate it at a spot on "Putney's Hill," reputed to be near the centre of the town. This controversy gave rise to two parties in town matters, the one led by a person who resided in the westerly part, (near where it was finally built,) and the other led by a resident in the lower part of the town. These parties continued their quarrels for a series of years. There never was a church or society established, nor a minister settled at this place of worship, but for eight or more years after it was built the pastor of the First Congregational Society preached there one quarter of the time. For many years, however, previous to 1831 there had not been any "Congregational preaching" there, though it was occasionally used by Universalist or Freewill Baptist preachers. In 1831, it having fallen into great decay, the building was sold to the Baptist Society of the East Village, and the materials employed in building their house at that place. The minister of the First Congregational Society, whose place of worship was in the East Village, used to give notice of meetings at this west meeting-house, and when doing so, uniformly spoke

of it as "the westerly part of the town." The testator was a church member, and attended regularly at the east meeting-house, unless there were services at the west meeting-house. The district around this old west meeting-house was by many persons designated as "the westerly part of the town," in distinction from the "the westerly half of the town," and also in distinction from the village called "Hill's Bridge," or "Contoocook Village."

For many years there has been, on questions which have come up in Hopkinton town meeting, a division into east and west parties, and then a range of land called "Putney's Hill" has been the dividing line of the parties.

Hill's Bridge, or Contoocookville, has grown very much within ten or fifteen years, and now would, in the opinion of many persons, accommodate a greater number of persons conveniently, as a place of worship, than any other point towards the westerly part of the town. There is a Freewill Baptist meeting-house in this village. In the east village there are the Baptist and Congregational meeting-houses, and an Episcopal Church. The Universalists have a meeting-house in the extreme westerly part of Hopkinton, four miles from this village. Contoocookville is not, in common parlance, nor in giving strangers directions, understood to mean "the west part of the town." Mr. Bailey, the testator, never attended public worship at this village, and indeed rarely went there for any purpose.

In 1836, several denominations, Congregationalists and Universalists, joined together and built the meeting-house now occupied by the plaintiffs. It was built by subscription, at an expense of $1300. It has never become the property of the plaintiffs. It is situated in Contoocook Village. Lines run at right angles from the centre of it to the east and west town lines, show the east (Concord) line to be 977 rods, and the west (Henniker) 980 or 1010 rods distant. It lies about 190 rods east of a line drawn due north and south through the town, and dividing it into equal parts. The new meet-

ing-house (called the Union House) is 276 rods easterly of a due south line, which would pass through the site of the old west meeting-house.   It is distant nearly three miles by the nearest travelled road from the First Society's meeting-house. The old west meeting-house was about the same distance from this " Union House," and about two and a half miles from the First Society's house.   The house occupied by the plaintiffs is 260 rods due west from the top of Putney's Hill, and by the road about two miles from the top of said hill.

In 1837, certain persons, most of whom were Universalists, and nearly all resident in or near Contoocook Village, claiming to be Congregationalists, formed themselves into a religious society, pursuant to the statutes of this State, under the name and style of " The Second Congregational Society in Hopkinton."   Nov. 4th, 1837, one Perkins was chosen clerk, and the Society fixed upon and established their place of public worship, &c. in Contoocook Village.   Dec. 9th or 10th, in the same year, the church and society "extended a call" to the Rev. David Kimball to become their pastor, which he at once accepted.   A council having been called to settle him, met at the clerk's house, Dec. 13, 1837, and the next day sundry individuals were organized into a church, the council examined and approved the candidate, and the ceremonies of installation took place, such as the installing prayer, propounding articles of faith, charge to the pastor, and the right hand of fellowship, &c., but there was no sermon.

Mr. Kimball had formerly been settled elsewhere, and regularly dismissed.   He then resided and still resides in Concord, nine miles from Contoocookville, being engaged some part of the time in the printing of a " religious newspaper." The understanding with him was that he should preach forty Sundays in each year ; be at the village on Saturdays and Mondays, when circumstances required it, and also attend funerals and services preparatory to the sacrament ; and that he should receive a salary of $200 per annum.   To make

up this amount, the Society relied on their proportion of Mr. Bailey's bequest and of the parsonage funds of the town, aided by a tax upon its own members. The pews have not been taxed. Only about $250 in all have been paid to Mr. Kimball. He preaches not more than two Sundays in a month ; frequently not so often ; sometimes not at all for two or three months. He never preached forty Sundays in one year. He has preached "preparatory lectures," but performed no other parochial services. Twelve members have been added to the church since its formation. There has been an understanding, since the payment of Bailey's bequest was refused to the society, that they would not be able to pay him so much as was agreed, and, therefore, could not expect so much preaching from him.

*Perley*, for the plaintiffs, contended that the deposition of Thomas Bailey was inadmissible, because he is a party, and not a mere formal party. *Gres. Eq. Ev.* 242 ; 1 *Greenl. Ev.* 405 ; 1 *Hoffman's Prac.* 488. He files interrogatories. He is examined on his own application. 2 *Maddock's Prac.* 415 ; 1 *Hoffman's Prac.* 488. The evidence which he gives, too, is incompetent, were the witness competent. So much as relates to the declarations of the testator and the draft of a former will, cannot control the will. 1 *Greenl. Ev.* 325, *and cases cited.*

Upon the merits of the case he argued that, it being admitted that the will was duly executed and proved, that a society has been formed, and that a surplus fund remains in the executor's hands, no ground remained for the defendants, unless it be pretended that there has not been a sufficient organization of the society, or a proper settlement of a minister.

1. Mr. Kimball was duly settled. 16 *Mass.* 488, 512, *Baker* vs. *Fales.*

2. He was settled by the " inhabitants of the westerly part of Hopkinton," within the meaning of the will.

We must suppose the testator's intent to have been a reasonable one. He never intended that all should join, or that his bounty should be defeated by one or two obstinate persons. 16 *Mass.* 488, 495, *Baker* vs. *Fales.* Giving the income to a Congregational Society, conveniently situated for the benefit of the largest number, is a compliance with the bequest ; otherwise the bequest can never take effect. But this court may carry the gift into effect, though a literal compliance be impracticable. 2 *Story's Eq.* 412, 415, 420.

The courts of this State had no jurisdiction in this matter originally. 2 *N. H. Rep.* 20. But they now have by statute.

3. " The westerly part of the town," if not controlled by something else, means the geographical west half of the town. The cases in 3 *Caines' R.* 299, *Jackson* vs. *Reeves,* and 1 *Johns. R.* 156, *Brandt* vs. *Ogden,* are on the same principle. Parol evidence cannot control this. *Greenl. Ev.* 333.

If the testator meant the neighborhood about the old west meeting-house, why did he not say so ? But he did not mean so. He had in his life-time seen it taken down and carried away ; how can it be supposed that he had any local attachment to that spot ?

If there were any popular name affixed to any particular district at the time the will was executed, its limits and boundaries should be shown.

If the geographical west half of the town is not the true division, the line must be Putney's Hill.

4. Has a clergyman, then, been settled by inhabitants of the westerly part of the town ? We say there has. They were bound to establish their house of worship where it would accommodate the greatest number of the beneficiaries ; or, what is the same thing, where the greatest number live. This has been done, and it is of no importance whether or not it is at the geographical centre. It could not have been established elsewhere. 12 *Mass.* 546, 563, *Phillips Academy* vs. *King.* Narrow, technical, and astute constructions are not to be given to a charity.

*I. Bartlett*, for the defendants. 1. Our first objection is, that the legacy is void at common law. " The westerly part of Hopkinton" is not sufficiently certain, at law, to constitute a devise. *Stat.* 43 *Eliz.*, ch. 4, gives the court no power in this matter, nor does any statute which we have adopted as a substitute. *Powell on Dev. (Phillips' Ed.,)* 214, 362; *Cornish on Uses* 68, 149 ; 4 *Wheat.* 33, and *cases cited.*

2. The settlement of a minister at Hill's Bridge was not within the meaning of the testator.

3. The pretended ceremonies of installation, and the pretended contract with Kimball, constitute no settlement, within the meaning of the will.

It is true that legacies for charitable uses, void at common law, may be sustained under the statute of 43 *Eliz.;* although that statute does not seem necessarily to bestow the power exercised under it, which, however, is now fully established. And, perhaps, our statutes are as broad as that, and give a similar power, *if the court see fit to exercise it.* Courts of equity in England seem sometimes *to have made wills*, in cases of intended charities, so as to prevent the estate from going to the heir, and preserve the charity. But here it is proposed, not to preserve the charity, but to take it from one charitable use and give it to another ; for the bequest over is to a charitable use. There is no occasion to apply the doctrine of *cy pres* in this case, because the estate may and can go in charity precisely in the way the testator intended. The English courts never interfere except to save the charitable use. 2 *Story's Eq.* 512–520. Chancery has not assumed to appoint a devisee when there was one to take.

*Pierce*, on the same side. The condition precedent has not been complied with by the plaintiffs. The persons who now claim, are not those intended by the testator. The expression, " inhabitants of the westerly part of Hopkinton,"

is too vague, indefinite, and uncertain for any action. Suppose only one inhabitant of the east part joins in the necessary preliminaries, what is the effect ? And if one may act, why not more ? or how many such in all may act ? The fact is, that but a very small portion of the residents in the geographical west half of Hopkinton have acted.

The case of *Baker* vs. *Fales*, 16 *Mass.* 488, does not fix the definition of settlement. The intention of the testator is to govern. 9 *Peters* 68, *Smith* vs. *Bell ;* 1 *P. Wms.* 425 ; 4 *Johns. Ch.* 63. Did he not intend a settlement *among* the people ? The meeting-house was dedicated by Universalists, only four days before the expiration of the three years. It was a mere *farce,* gone through to secure the bequest.

If the court hold that the provision is not so indefinite but that it may be determined, we say that the testator referred to a particular locality, and we point to the centre of a district known as " the westerly part of Hopkinton," of which district we may not, indeed, be able to fix the exact limits, but which we show to have been the one which this testator undoubtedly had in his mind, be its limits what they may.

*Perley*, in reply.

PARKER, C. J. We are of opinion that the deposition of Thomas Bailey must be suppressed. He is a party to the suit, and cannot be examined except upon leave granted by the court, or by a judge in vacation, for that purpose. If it appears that a party has no interest in the subject matter respecting which his testimony is required, leave is granted, as of course, subject to farther exceptions. The rule, and the reason of it, are thus stated in *Gresley's Equity Evidence* 338 : " As a suit in equity often contains many issues, and the general rule compels all who are interested in any way to be made parties, either plaintiffs or defendants, it often happens that a person who could furnish material evidence

respecting one point in dispute, is precluded from doing so by being made a party, in consequence of some interest in another point. Others, who might be witnesses, are often made parties for form's sake, as a mere trustee. Leave is, therefore, frequently given in equity, for a party to be examined, on motion, suggesting that he is *not interested*, and *saving all just exceptions*. The interest spoken of in the motion is, interest in the matter to be examined into, not interest generally in the cause." See, also, 1 *Greenl. Ev.* 361. " Defendants who are trustees, or who have otherwise been made parties for mere form's sake, and against whom no decree is prayed, are always examined if necessary." *Gresley's Eq. Ev.* 339.

But it has been held that an executor in trust is not capable of being examined for his *cestui que trust*. The reasons given have been that he is answerable for *devastavits*, is liable to be sued by creditors and to answer in costs, and has something more in him than the mere legal right as a bare trustee. *Gresley* 340 ; 3 *P. Wms.* 181, *Croft* vs. *Pyke ;* 3 *Atk.* 96, *Perrot* vs. *Perrot.* Unless we should be justified in departing from the rule thus laid down, it seems that a motion for the examination of the defendant Bailey must have been overruled, had it been made.

Upon the evidence before us, we are of opinion that the plaintiffs are not entitled to the benefit of the bequest in the will of Amos Bailey. They cannot be regarded as legatees. There is no corporation or party which could establish a legal title to the bequest. " The westerly part of Hopkinton" is the westerly part of a territorial corporation ; but we are not aware of any rule by which that westerly part can be designated or divided from the rest, territorially or otherwise, so that we can say, here stands a party legally entitled to the possession of this fund. It has been held that the term " northerly" in a grant, where there is no object mentioned to direct the inclination of the course towards the east or

west, is construed to mean *due north.* 1 *Johns. R.* 156, *Brandt* vs. *Ogden ;* but the rule will render us little aid here, for there is no point to start from. The easterly part of Hopkinton is not included, and the question, "where is the line to be drawn north and south which is to sever the westerly part of Hopkinton from the easterly part," is one of difficult solution.

It is sufficient, however, in this case, if the plaintiffs can establish an equitable title to the legacy ; and extrinsic evidence of the existing state of facts may be admitted, for the purpose of ascertaining who was intended as the object of the testator's bounty, as well as to show the subject of disposition, or the quantity of interest given by a will. "A court may inquire into every material fact relating to the person who claims to be interested under the will, and to the property which is claimed as the subject of disposition, and to the circumstances of the testator, and of his family and affairs, for the purpose of enabling the court to identify the person or thing intended by the testator, or to determine the quantity of interest he has given by his will." 1 *Greenl. Ev.* 287, *note ; Wigram on the admission of Extrinsic Evidence* 51.

But the plaintiffs can derive no aid from this principle. There is some evidence to show what was known in general terms as " the westerly part of Hopkinton ;" but the plaintiffs do not come within the specification, nor do they appear to have been in any way within the contemplation of the testator, except as the individuals composing the Second Congregational Society may be a component part of the mass of inhabitants residing in the westerly part of the town. The village which now exists in the part of the town where the meeting-house of the plaintiffs is situated, has grown up since the will was made, into a size which it did not even promise at that time ; and the religious society there existing, and appearing as plaintiffs in this case, has been formed entirely since that time, and even since the testator's death.

Whether the plaintiffs might not have established a claim to the bequest, although they do not comprise all that has been, in a loose manner, designated as "the westerly part of Hopkinton," and although they have acquired their existence as a society since the execution of the will, upon the ground that they were within the contemplation of the testator, if no other facts appeared than those already adverted to, we need not enquire.    There is other evidence in the case which, we think, conclusively shows that the testator had no reference to them, and that they do not substantially appear to be the object of the testator's bounty.    The evidence shows that there had been, for the term of twenty-five years or more, a meeting-house within the westerly part of Hopkinton, situated nearer the territorial centre of that westerly part than the plaintiffs' house, near which the testator resided, and at which he had been accustomed to worship.   There had also been originally a controversy in the town respecting the location of the meeting-house, which seems to have ended in the erection of two, one in the east village and the other near the residence of the testator.    The neighborhood where the last named meeting-house stood, according to the testimony of several witnesses, " has been known by the name of the westerly part of Hopkinton."    As often happens in such cases of controversy, it seems that the burden of supporting a minister and providing for public worship at this place, was too great for those who lived in that section, and the house was taken down in the life time of the testator, one witness says in 1831, which was the year in which the will was made.

As the case appears before us upon these facts, we cannot doubt that the testator was desirous of encouraging the reëstablishment of public worship at or near that place; and that the bequest to " the westerly part of Hopkinton" was designed to aid in the accomplishment of that object.   And if the inhabitants of that part of the town had reëstablished public worship at that place, in the manner provided in the

clause in the will, there would probably have been no question respecting their right to the legacy; or if there had been, the fact that they had no corporate existence as "the westerly part of Hopkinton," and no well defined territorial limits answering to such a designation, might have interposed no obstacle to a decree in their favor, under our equitable jurisdiction in cases of trusts. But if, instead of settling a minister in the ordinary mode, whose duty it would be to reside among them and perform all the customary parochial duties, they had merely engaged one who resided in another town, to preach on Sundays, provided they could obtain possession of this legacy, we are of opinion that it would not have been a compliance with the condition of the bequest, and they must have failed in an attempt to recover the income of the fund, for that reason. And this is all the plaintiffs have done to bring themselves within the terms of it.

They have, perhaps, gone through the customary forms for the settlement of a minister, agreeably to the usages of the Congregational denomination. There has been the organization of a society, the letters missive, the convening of a council, the gathering of a church, the call of a minister by the church and society, the acceptance, the due examination of the candidate, the evidence of his qualifications satisfactory to the council, and the installation in due and solemn form of one who had before been ordained as a minister of the gospel. But behind all this is the evidence that the incumbent was to receive but $200 the year, and that he not only resided in another town, where he was pursuing a secular business, (connected it is true with religious purposes,) and that he did not change his residence; but the inference is apparent that it was probably well understood that this foreign residence and business were to continue; and, if the society failed of obtaining the income of Mr. Bailey's legacy, this settlement was to dwindle down into an engagement for occasional preaching. However laudable all this may have been, if the means of the society were

inadequate to the support of a minister, it does not seem to us to be such a settlement as the testator contemplated.    We do not say that the settlement must have been irrespective of the provision that the testator had made, or that the minister should have been required to reside within his parish all the time ; but we are of opinion that a settlement, to be within the provision of the testator's will, should have been something more than the ordinary formalities of ordination or installation, superadded to an engagement for preaching upon Sunday and other stated days, without any provision for residence or other parochial duties.

But the plaintiffs contend that the court have power to carry the gift into effect, although a literal compliance is impracticable.    Sitting as a court of equity, by virtue of the general jurisdiction we have over gifts to charitable uses, if the charitable intention of the testator could not be carried into effect, we might perhaps apply the doctrine technically called *cy pres*, and, to prevent a failure of the charity, direct the income of the fund to be applied to the use of some other congregation in Hopkinton than that which the testator intended.    But, in that case, it might deserve inquiry whether the objections to the settlement of the minister, already referred to, would not exclude the plaintiffs, and compel us to direct an inquiry whether there was not some other congregation in the town, which, having a minister ready to perform all parochial services which might be required by the inhabitants of the westerly part, would be better entitled to come in to the succession as *next of kin.* But happily the testator has relieved us from all difficulty on this point.    " If they do not settle a Congregational minister in the westerly part of Hopkinton within three years" after his decease, he directs the interest of the whole to go to the First Congregational Society.    This court have no jurisdiction to devise a new scheme for a charity, so long as that devised by the donor may take effect.    2 *Story's Eq.*, § 1176.                                                    *Bill dismissed.*